IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | |
| | § | |
| CORNERSTONE WEALTH | § | |
| CORPORATION, INC., d/b/a | § | Civil Action No. 3:98-CV-0601-D |
| CREDIT FINANCIAL AND ASSOCIATES | § | |
| and CREDIT FINANCIAL SERVICES, | § | |
| a corporation, and JOHN R. ATCHLEY, JR., | § | |
| individually and as an officer of | § | |
| the corporation, | § | |
| | § | |
| Defendants. | § | |

MEMORANDUM OPINION
AND ORDER

The court must decide whether defendants should be held in civil contempt for violating a

stipulated consent order for permanent injunction and civil penalties ("Consent Judgment"), under

which defendants were enjoined from violating the Credit Repair Organizations Act ("CROA"), 15

U.S.C. §§ 1679-1679j.  Concluding under a clear and convincing evidence standard, and for the

reasons that follow,[1] that defendants are violating the Consent Judgment and CROA, the courts holds

them in civil contempt.

I

In 1998 plaintiff United States of America, acting on behalf of the Federal Trade

Commission, sued defendants Cornerstone Wealth Corporation, Inc., d/b/a Credit Financial and

Associates and Credit Financial Services ("Cornerstone"), and John R. Atchley, Jr. ("Atchley"),

---

[1]As permitted by Fed. R. Civ. P. 52(a), the court sets out its findings of fact and conclusions
of law in this memorandum opinion and order.

alleging that they were violating CROA.  Cornerstone is a credit repair organization ("CRO") within the meaning of CROA.  Atchley is an operator of a CRO.  On December 4, 1998 the court entered the Consent Judgment.  In pertinent part, it permanently restrains and enjoins defendants "from violating the CROA, 15 U.S.C. §§ 1679-1679j, as presently enacted or as it may hereinafter be amended . . . ."  Gov't Ex. A at 5.  Although this proviso specifies two violations that are enjoined, it explicitly states that the listing is non-exclusive and includes, but is not limited to, the enumerated violations.  Id.  The Consent Judgment also permanently restrains and enjoins defendants "from charging or receiving any money or other valuable consideration for the performance of any service which the Defendants have agreed to perform for the purpose of improving any consumer's credit record, credit history, or credit report before such service has been fully performed."  Id. at 4.  This provision enjoins conduct that § 1679b(b) forbids.

On November 2, 2005 the government filed a motion for an order to show cause why defendants should not be held in civil contempt.[2]  It maintains that defendants are violating the Consent Judgment in two respects: first, Cornerstone is providing services to consumers before the expiration of three business days after the consumer has signed a written contract; and, second, Cornerstone is charging for services that it has agreed to perform before the services have been fully performed.  On November 7, 2005 the court issued a show cause order setting the motion for a hearing.  After granting two continuance requests filed by defendants, the court conducted an evidentiary hearing on February 27, 2006.

---

[2]The government also filed a separate lawsuit against defendants, which has been docketed as Civil Action No. 3:05-CV-2147-D, in which it seeks civil penalties against them for violating CROA after they entered into the Consent Judgment.  The suit is currently in the pretrial scheduling phase.

II

To prove that defendants should be held in civil contempt, the government "must establish by clear and convincing evidence that (1) a court order was in effect, (2) the order required specified conduct by the respondent, and (3) the respondent failed to comply with the court's order." *United States v. City of Jackson, Miss.*, 359 F.3d 727, 731 (5th Cir. 2004). "A consent order, while founded on the agreement of the parties, is nevertheless a judicial act, enforceable by sanctions including a citation for contempt." *Whitfield v. Pennington*, 832 F.2d 909, 913 (5th Cir. 1987) (citing *United States v. City of Miami*, 664 F.2d 435, 439-40 (Former 5th Cir. Dec. 1981) (en banc)). "The contemptuous actions need not be willful so long as the contemnor actually failed to comply with the court's order." *Am. Airlines, Inc. v. Allied Pilots Ass'n*, 228 F.3d 574, 581 (5th Cir. 2000) (citing *NLRB v. Trailways, Inc.*, 729 F.2d 1013, 1017 (5th Cir. 1984)). "[I]n civil contempt proceedings the question is not one of intent but whether the alleged contemnors have complied with the court's order." *Jim Walter Resources, Inc. v. Int'l Union, United Mine Workers of Am.*, 609 F.2d 165, 168 (5th Cir. 1980) (quoting *United States v. Ross*, 243 F. Supp. 496, 499 (S.D.N.Y. 1965)). In the contempt context, "clear and convincing evidence" is that "weight of proof which produces in the mind of the trier of fact a firm belief or conviction as to truth of the allegations sought to be established, evidence so clear, direct, weighty and convincing as to enable fact finder to come to a clear conviction, without hesitancy, of the truth of the precise facts of the case." *Travelhost, Inc. v. Blandford*, 68 F.3d 958, 961 (5th Cir.1995) (internal quotation marks omitted) (adopting in contempt context definition of clear and convincing evidence used in attorney disbarment proceeding) (quoting *In re Medrano*, 956 F.2d 101, 102 (5th Cir. 1992)).

Defendants concede that, as to both allegations, the government meets the first element of

the contempt test, i.e., a court order was in effect.  Concerning the allegation that Cornerstone is providing services to consumers before the expiration of three business days after the consumer has signed a written contract, defendants contend that the government cannot satisfy the second and third elements.  Defendants maintain that they cannot be held in contempt because this requirement is not specified in the Consent Judgment (which they contend only prohibits them in general terms from violating CROA), and they posit that § 1679d(a) permits a CRO to provide services before the end of three business days so long as it does so under a written contract that complies with CROA.  As to the second allegation, defendants assert that the government cannot satisfy the third element of the contempt test. They acknowledge that CROA forbids a CRO from charging for a service that it has agreed to perform before the service is fully performed, but they assert that Cornerstone is not charging for services "that it has agreed to perform."  Defendants also proffer a type of government estoppel defense, contending that, during the litigation and settlement of this case in 1998, a government attorney essentially approved, or led them to believe there was no objection to, the practices that the government now challenges.

III

The government alleges that defendants should be held in civil contempt because Cornerstone provides services to consumers before the expiration of three business days after the consumer has signed a written contract.  Section 1679d of CROA provides:

>  (a)  Written contracts required
>
>  No services may be provided by any credit repair organization for
>  any consumer—
>>  (1) unless a written and dated contract (for the
>>  purchase of such services) which meets the
>>  requirements of subsection (b) of this section has been
>>  signed by the consumer; or
>>  (2) before the end of the 3-business-day period
>>  beginning on the date the contract is signed.

The evidence is undisputed that Cornerstone provides services to consumers before the expiration of three business days after they have signed written contracts.  The court will therefore address defendants' arguments for why they should not be held in civil contempt.

## A

Defendants argue that because § 1679d(a) uses the disjunctive term "or," a CRO can legally begin providing services before the end of three business days, provided it enters into a written contract with the consumer that complies with CROA's requirements.  They reason that CROA in effect creates a statutory incentive for CROs to enter into written contracts with consumers, because doing so allows them to begin providing services immediately.  The ineluctable corollary to this argument is that, if a CRO waits three business days before providing credit repair services, it can do so without entering into a written contract with the consumer.  The court rejects defendants' position.

"The plain meaning of legislation should be conclusive, except in the 'rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters.'"  *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 242 (1989) (quoting *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 571 (1982)).  "In ascertaining the plain meaning of the statute, the court must look to the particular statutory language at issue, as well as the language and

design of the statute as a whole." *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988) (citing

*Bethesda Hosp. Ass'n. v. Bowen*, 485 U.S. 399, 403-405 (1988); *Offshore Logistics, Inc. v.

Tallentire*, 477 U.S. 207, 220-221 (1986)).  "It is 'a cardinal principle of statutory construction' that

'a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence,

or word shall be superfluous, void, or insignificant.'" *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001)

(quoting *Duncan v. Walker*, 533 U.S. 167, 174 (2001)).  Moreover, "there are dangers in attempting

to rely too heavily on characterizations such as 'disjunctive' form versus 'conjunctive' form to

resolve difficult issues of statutory construction. Although connecting words such as 'and,' 'or,' or

'also' are often helpful keys to unlocking Congress's intent, we must still look at all parts of the

statute." *Kelly v. Wauconda Park Dist.*, 801 F.2d 269, 270 n.1 (7th Cir. 1986).

When § 1679d(a) and the language and design of CROA are interpreted as a whole, and

CROA's clauses, sentences, and words are construed in a manner that does not render any of them

superfluous, void, or insignificant, it is clear that § 1679d(a) (1) and (2) are to be read conjunctively.

Consequently, a CRO cannot legally provide credit repair services until the consumer has signed a

written and dated contract that meets the requirements of § 1679d(b) *and* three business days have

elapsed after the date the contract is signed.

First, defendants' interpretation of § 1679d(a) effectively ignores the plain language of

§ 1679d(a)(2).  Under § 1679d(a)(2) the three-business-day waiting period commences on the date

the contract is signed.  If no written contract is signed by the consumer, the three-day period that

defendants say must be completed before a CRO can provide services without a written contract

never commences.

Second, not only does CROA lack any explicit indication that a contract can be oral,

§ 1679e(c) corroborates that it cannot.  Section 1679e(c) applies to "any contract" between a CRO and a consumer and provides:

> Any consumer who enters into *any contract* with any credit repair organization shall be given, by the organization—
>> (1) *a copy of the completed contract* and the disclosure statement required under section 1679c of this title; and
>> (2) a copy of any other document the credit repair organization requires the consumer to sign,
> at the time *the contract* or the other document *is signed*.

(Emphasis added).  Obviously, a CRO can neither provide a consumer a copy of an oral contract nor can it do so at the time the contract *is signed*.  CROA therefore leaves no room for defendants' contention that a written contract is unnecessary so long as a CRO waits three business days to begin providing services.  Because this premise fails, the necessary concomitant of defendants' contention—that a CRO that obtains an executed contract that complies with CROA can begin providing services immediately—also lacks force.

Third, CROA is infused with Congressional intent that consumers engage the services of a CRO only after they have signed written contracts that comply with CROA's requirements.  There are multiple provisions that indicate that contracts must be in writing.  *See* 15 U.S.C. §§ 1679c(a) (providing that consumer must be told in writing: "You have the right to cancel your contract with any credit repair organization for any reason within 3 business days from the date you signed it."); 1679c(b) ("The written statement required under this section shall be provided as a document which is separate from any written contract or other agreement between the credit repair organization and the consumer or any other written material provided to the consumer."); 1679d(a) (requiring written contracts); 1679d(b) (specifying terms and conditions of contracts, including that they be in writing); 1679e(c) (providing that consumer must be given copy of "any contract" entered into with a CRO).

A logical understanding of defendants' position is that *no* contract is necessary if a CRO is willing to wait three business days before providing services. If accepted, this argument would render several provisions of CROA superfluous.

B

Defendants also maintain that they cannot be held in civil contempt because the Consent Judgment does not specifically enjoin them from providing services to consumers before the expiration of three business days after the consumer has signed a written contract, and the Consent Judgment therefore does not require specified conduct.[3] The court disagrees.

"A party may be held in contempt if he violates a definite and specific court order requiring him to perform or refrain from performing a particular act or acts with knowledge of that order." *Whitfield*, 832 F.2d at 913 (citing *SEC v. First Fin. Group of Tex., Inc.*, 659 F.2d 660, 669 (5th Cir. Oct. 1981)). Section III of the Consent Judgment explicitly provides that defendants are restrained and enjoined "from violating the CROA, 15 U.S.C. §§ 1679-1679j, as presently enacted or as it may hereinafter be amended . . . ." Gov't Ex. A at 5. Section 1679d(a) prohibits a CRO from providing services to a consumer before the end of a three-business-day period, beginning on the date the contract is signed. The Consent Judgment definitely and specifically puts defendants on notice that

---

[3]The government and defendants both rely on the tripartite contempt test set out in *City of Jackson*, which refers to an order that requires "specified" conduct. *City of Jackson*, 359 F.3d at 731. The court does so as well. *See supra* at § II. The more common formulation found in Fifth Circuit cases refers to "certain" conduct rather than to "specified" conduct. *See, e.g., Test Masters Educ. Servs., Inc. v. Singh*, 428 F.3d 559, 581-82 (5th Cir. 2005) ("A movant in a civil contempt proceeding bears the burden of establishing by clear and convincing evidence 1) that a court order was in effect, 2) that the order required certain conduct by the respondent, and 3) that the respondent failed to comply with the court's order." (citing *Martin v. Trinity Indus., Inc.*, 959 F.2d 45, 47 (5th Cir. 1992); *Piggly Wiggly Clarksville, Inc. v. Mrs. Baird's Bakeries*, 177 F.3d 380, 383 (5th Cir.1999)), *petition for cert. filed*, ___ U.S.L.W. ___ (U.S. Feb. 14, 2006) (No. 05-1043). For purposes of today's decision, the difference in terminology is immaterial.

- 8 -

they are restrained and enjoined from violating CROA, including § 1679d(a). Defendants have not demonstrated that a clause of the type in question lacks sufficient precision and clarity to be enforceable by civil contempt.

Accordingly, the court finds defendants in civil contempt for violating the Consent Judgment and CROA on this basis.

## IV

The government also alleges that Cornerstone is charging for services that it has agreed to perform before the services have been fully performed. The court finds that the government has established by clear and convincing evidence that, under the guise of the so-called "guarantee" section of the Cornerstone Service Contract Agreement ("SCA"), Cornerstone in fact charges in advance for services not yet fully performed.

## A

Cornerstone and its clients enter into an SCA at the inception of the relationship. Under the SCA, the fee structure is based on Cornerstone's providing three services. Although the services are described in the SCA as being "individual," and Cornerstone agrees to perform the services "in return for payment by the Client of the agreed upon amount for each such service," *e.g.*, Gov't Ex. I at [1], in reality Cornerstone charges a single fee for all three. The first service, called "administrative fee," consists of setting up the client's file with an account number and completing and/or reviewing the confidential profile, Cornerstone's contracts, disclosure statements required by federal and state law, and all necessary forms. The second service is called "strategic profile." This service consists of a credit specialist's reviewing the client's credit report and formulating a strategy as to the most effective way to investigate the client's credit report for accuracy. The third

service is called "verification process."  This service is composed of Cornerstone's preparing an

initial set of verification requests to credit bureaus.[4]  The total fee for these three services is collected

the day a consumer signs the SCA, within a few days thereafter, or partly within a short time frame

after signing the SCA and in monthly installment payments, which can extend for a period of several

months.   The SCA provides that "After the initial set of verification requests are completed,

Cornerstone has completed the services required to be delivered under this Service Contract."  *E.g.,*

Gov't Ex. I at [2].

CROA provides that "No credit repair organization may charge or receive any money or

other valuable consideration for the performance of any service which the credit repair organization

has agreed to perform for any consumer before such service is fully performed."   15 U.S.C.

§ 1679b(b).  This requirement can present a marketing hurdle for CROs like Cornerstone that may

charge thousands of dollars for services that by contract are completed after sending an initial set

of verification requests.  *See* Gov't Ex. K at [3] (reflecting fee of $4,300, discounted to $2,150).  So

Cornerstone provides a so-called two-year "guarantee."   Its representatives tout the "guarantee"

during the initial client interview as a valuable component of Cornerstone's entire credit repair

services.  It can be fairly inferred that Cornerstone considers the "guarantee" to be an integral part

of its services, certainly a component that enhances their potential value and enables Cornerstone

to command a higher fee.

Under the "guarantee," Cornerstone contractually promises that its services are "100%

---

[4]Through at least May 2000 the SCA provided that the "verification process" was complete once Cornerstone had "written and mailed an initial set of verification requests . . . ."  Gov't Ex. F at 88.  It changed the SCA to state that this service has been fully performed when Cornerstone has "prepared an initial set of verification requests . . . ."  Gov't Ex. E at 82.

GUARANTEED TO CORRECT YOUR CREDIT PROFILE OR YOUR MONEY BACK." *Id.* at

[4] (asterisks omitted).  The SCA defines the "guarantee" as follows:

> After the initial set of verification requests are completed,
> Cornerstone has completed the services required to be delivered
> under this Service Contract.  If the inaccurate or obsolete information
> remains on your credit report, Cornerstone guarantees that for no
> additional charge to the Client, Cornerstone will re-verify your credit
> information until inaccurate or obsolete information is resolved on
> the credit report, for up to two years after the date of this Service
> Contract.

*Id.*  The definition also provides that the "guarantee" is subject to eight explicit conditions and that

it will remain in effect for up to two years after the date of the SCA, provided the client abides by

the conditions.  Several of the eight require that the client act or refrain from acting in a specified

manner.  One provides that "Any breach of the Service Contract by the Client shall be grounds for

Cornerstone ceasing all performance under this Service Contract, and accelerating the Service

Contract." *Id.*  This provision would apparently apply not only to Cornerstone's services under the

"guarantee" but to the entire SCA.  It would also seem to entitle Cornerstone to accelerate the

client's outstanding fee balance for services already completed, based on the breach of a condition

of a "guarantee" that supposedly was provided for no additional charge.

B

Before assessing whether the "guarantee" is in reality a service under CROA for which

Cornerstone charges its clients before it fully performs the service, the court will address defendants'

contention that the parol evidence rule precludes such an inquiry.  Defendants essentially contend

that the parol evidence rule prohibits the court from finding that the "guarantee" is something

different from what the SCA says it is: a conditional commitment by Cornerstone, for no additional

charge, to re-verify a client's credit information until inaccurate or obsolete information is resolved

- 11 -

on the credit report, for up to two years after the date of the SCA.[5]  Because defendants rely on the

Texas parol evidence rule, the court will apply Texas law to illustrate why defendants' argument

lacks force.  In doing so, it does not suggest that the law of any particular state controls over CROA.

Under Texas law,

> The parol evidence rule is not a rule of evidence but, rather, is a rule
> of substantive contract law.  The rule functions as an evidentiary rule
> in that extrinsic evidence which seeks to vary, add to, or contradict
> the terms of a written agreement is inadmissible.  As a substantive
> rule, the parol evidence rule denies efficacy to prior or
> contemporaneous expressions relating to the same subject matter as
> that encompassed in the final written contract between the parties.

*Boy Scouts of Am. v. Responsive Terminal Sys., Inc.*, 790 S.W.2d 738, 744 (Tex. App. 1990, writ

denied) (citations omitted).  It is, however, "well established that extrinsic evidence is admissible

to show fraud[ulent] inducement to enter into a written contract."  *Tracy v. Annie's Attic, Inc.,* 840

S.W.2d 527, 532 (Tex. App. 1992, writ denied) (citing *Paxton v. Spencer*, 503 S.W.2d 637, 643

(Tex. Civ. App. 1973, no writ); *Roy Klossner Co. v. McIntire*, 301 S.W.2d 197 (Tex. Civ. App.

1957, writ ref'd n.r.e.)).

In this case, the government is not attempting to vary, add to, or contradict the terms of SCA

in a manner that the parol evidence rule would prohibit.  What it is attempting to do is more akin to

a permissible showing of fraudulent inducement: to establish that, regardless what the SCA says,

Cornerstone's representatives tell consumers the two-year guarantee is part of the services they are

purchasing for the fees they are paying.  The parol evidence rule does not preclude the court from

---

[5]Defendants' counsel argued during the hearing that the "guarantee" is not a service that
Cornerstone has "agreed to perform."  This assertion is belied by the terms of the "guarantee" itself,
which obligates Cornerstone to re-verify credit information until inaccurate or obsolete information
is resolved on the credit report, provided such information remains and the client meets the
requirements to keep the guarantee in effect.

relying on extrinsic evidence to determine the true nature of the "guarantee" provisions of the SCA.[6]

C

The court finds by clear and convincing evidence that, via the "guarantee," Cornerstone charges for services before they have been fully performed.

First, the "guarantee" is unquestionably a service under CROA.  Section 1679a(3) makes clear that a CRO's services include "any service . . . for the express or implied purpose of . . . improving any consumer's credit record, credit history, or credit rating; or . . . providing advice or assistance to any consumer with regard to any [such] activity or service . . . ."  When Cornerstone re-verifies a client's credit information until inaccurate or obsolete information is resolved on the credit report, it is providing such a service.

Second, Cornerstone charges for the services it provides under the "guarantee," and it does so as part of its fee, before the services have been fully performed.  Despite language in the SCA that says that Cornerstone's services are finished once the initial set of verification requests is completed, Cornerstone representatives lead clients to believe they are purchasing credit repair services for a substantial period of time, up to a maximum of two years.  They describe Cornerstone's services as possibly taking at least six to eight months, and perhaps even longer.  They do not emphasize that the services have been completed when the initial meeting ends, or once Cornerstone prepares the initial set of verification requests.  This allows Cornerstone to maximize in the client's mind the value of the services being purchased and the reasonableness of the fee.  Although Cornerstone appears to offer the so-called "guarantee" for no additional charge, in reality it uses the services that

_____

[6]On the same reasoning, the court also denies defendants' February 27, 2006 motion to strike.

it promises to perform under the "guarantee" to justify the fee it charges initially.

Cornerstone's intent to market a long-term relationship that blurs the distinctions between its initial services and those rendered under the "guarantee" is also reflected in the documents that clients receive.  Cornerstone's written "instructions for credit repair" explicitly refer to a credit repair time frame that "should take up to six to eight months to repair a single report."  Govt' Ex. K at [6]. The instructions also state that the process could take a longer period if creditors are persistent in verifying the client's credit report.  The "other terms and conditions" section of the SCA likewise corroborates what clients are told orally and in writing about the supposed nature of their relationship with Cornerstone.  It describes Cornerstone's "procedures" as "a carefully constructed *series of verifications and corrections* . . . ."  *Id.* at [4] (emphasis added).  And it contains the client's agreement that, with respect to unresolved inaccuracies in his credit report, he will "allow Cornerstone to work on my behalf in these matters, *whether on the original services or on the guarantee* for a minimum of 180 days up to a maximum of two years, unless I provide Cornerstone 30 days written notice by certified mail to cancel this authority . . . ."  *Id.* (emphasis added).

The evidence of Cornerstone's oral representations, coupled with relevant written documents that clients receive, corroborates that Cornerstone actually charges for all the services it provides, including those rendered under the rubric of the "guarantee."  The "guarantee" is nothing more than an artifice that enables Cornerstone to charge for services before they have been fully performed. The fee structure is set up so that Cornerstone can justify a higher, if not significantly higher, initial fee by leading clients to believe they are paying for credit repair services that will be rendered over a considerable time period, not services that, as the SCA says, are completed once the initial set of

verification requests is prepared.  Although it can be inferred that consumers accord sufficient value to this service to warrant paying some fee (perhaps even a substantial one), it can also be reasonably inferred from the testimony and other evidence that clients are led to believe they are purchasing much more than one set of verification requests, and that the initial meeting is the beginning of a lengthy relationship under which Cornerstone will continue to provide credit repair services according to the terms and conditions of the "guarantee."  This enables Cornerstone to appear to charge only for the three services specified in the SCA, and to collect the fee for these services without violating CROA.  But this appearance of compliance with CROA collapses once the evidence is assessed.

Defendants introduced evidence at the hearing that many of its clients never enact the "guarantee."  They contend that this shows the "guarantee" is not considered a purchased service. This proof does not alter the court's reasoning.  At best, it may mean that Cornerstone in some cases does not violate CROA and the Consent Judgment by charging for services before they have been fully performed.  At worst, it means that some consumers pay for services that Cornerstone charges for but *never* performs, which clearly violates CROA and the Consent Judgment.

Accordingly, the court finds defendants in civil contempt for violating the Consent Judgment and CROA on this basis.

V

Defendants maintain that they should not be held in civil contempt because, during the 1998 negotiations that led up to the Consent Judgment, a government attorney made statements or engaged in conduct that led them to believe the practices now at issue would not violate CROA or the Consent Judgment.  The court rejects this defense.

- 15 -

> To establish estoppel against the government, a party must prove affirmative misconduct by the government and also establish the four traditional elements of the doctrine. The four elements of estoppel are: (1) that the party to be estopped was aware of the facts, and (2) intended his act or omission to be acted upon; (3) that the party asserting estoppel did not have knowledge of the facts, and (4) reasonably relied on the conduct of the other to his substantial injury.

*Moosa v. INS*, 171 F.3d 994, 1003 (5th Cir. 1999) (quoting *United States v. Bloom*, 112 F.3d 200, 205 (5th Cir. 1997)). "Valid assertions of equitable estoppel against the Government are rare indeed." (citing cases). Defendants did not establish the elements of estoppel. At a minimum, they did not prove by a preponderance of the evidence that the government attorney engaged in affirmative misconduct by making statements or engaging in conduct that led defendants to believe the practices at issue would not violate CROA or the Consent Judgment.

VI

A

"Upon a finding of contempt, the district court has broad discretion in assessing sanctions to protect the sanctity of its decrees and the legal process." *Test Masters Educ. Servs., Inc. v. Singh*, 428 F.3d 559, 582 (5th Cir. 2005) (citing *Am. Airlines*, 228 F.3d at 585), *petition for cert. filed*, ___ U.S.L.W. ___ (U.S. Feb. 14, 2006) (No. 05-1043). "Judicial sanctions in civil contempt proceedings, may in a proper case, be employed for either or both of two purposes: to coerce the defendant into compliance with the court's order, and to compensate the complainant for losses sustained." *Am. Airlines*, 228 F.3d at 585 (quoting *United States v. United Mine Workers of Am.*, 330 U.S. 258, 303-04 (1947)). "The imposition or denial of sanctions of necessity involves a fact-intensive inquiry into the circumstances surrounding the activity that is the subject of sanctions." *Test Masters*, 428 F.3d at 582 (quoting *Thomas v. Capital Sec. Servs., Inc.*, 836 F.2d 866,

873 (5th Cir. 1988) (en banc)).  When a contempt sanction is coercive, "the district court has broad discretion to design a remedy that will bring about compliance."  *Perfect Fit Indus., Inc. v. Acme Quilting Co.*, 673 F.2d 53, 57 (2d Cir. 1982) (citing *Vuitton et Fils S.A. v. Carousel Handbags*, 592 F.2d 126, 130 (2d Cir. 1979); *Powell v. Ward*, 643 F.2d 924, 933 (2d Cir. 1981) (per curiam)).  The court can require that the contemnors pay reasonable attorney's fees incurred by the moving party in obtaining a contempt finding.  *See Cook v. Ochsner Found. Hosp.*, 559 F.2d 270, 272 (5th Cir. 1977) ("Courts have, and must have, the inherent authority to enforce their judicial orders and decrees in cases of civil contempt.  Discretion, including the discretion to award attorneys' fees, must be left to a court in the enforcement of its decrees." (citing *United Mine Workers*, 330 U.S. at 303-304)).  The court is also permitted to impose a conditional fine for the purpose of compelling the contemnor to comply with the court's order, provided the amount is reasonably designed to force compliance, without being punitive.  *In re Dinnan*, 625 F.2d 1146, 1149 (5th Cir. 1980) (per curiam) (citing *United Mine Workers*, 330 U.S. at 303-04).  "A coercive, nonpunitive fine payable to the clerk of the court is an appropriate tool in civil contempt cases."  *Id.* (citing cases and treatise).

B

1

Cornerstone must immediately cease and desist from providing credit repair services to consumers until three business days have elapsed from the signing of a contract that complies with CROA.  Beginning March 13, 2006, for each business day that Cornerstone fails to comply with this requirement, defendants must pay to the clerk of court a fine in the sum of $500.[7]  The court bases

---

[7]In defendants' opening statement, their counsel asserted that Cornerstone will change its practices if the court rules that it must change.  If that assertion is corroborated by Cornerstone's conduct, it will never be necessary for it to incur this conditional fine.

this amount on the evidence developed during the hearing concerning the approximate number of clients Cornerstone has and the range of fees that it charges its clients. The court finds that this sum is reasonably designed to force compliance, without being punitive.

To the extent this requirement makes it necessary for Cornerstone to change the definitions of its services in the SCA, it must do so. For example, although it is clear under CROA that merely signing a contract with a consumer is not a service,[8] other work that Cornerstone performs, even as part of the "administrative fee" and "strategic profile," falls within the scope of § 1679a(3) ("any service . . . for the express or implied purpose of . . . improving any consumer's credit record, credit history, or credit rating; or . . . providing advice or assistance to any consumer with regard to any [such] activity or service . . . ."). Before any change in the SCA can take effect, however, defendants must provide the government 30 calendar days to review the amended SCA form so that it can lodge objections in this court to the proposed changes. If no objections are timely filed, Cornerstone may begin using the amended SCA form. If objections are timely filed, it must await court approval before using the amended SCA.

## 2

Cornerstone must immediately cease and desist charging or receiving any money or other valuable consideration from consumers for credit repair services that have not been fully performed. Cornerstone must immediately remove from its SCA the "guarantee" that is the subject of this contempt proceeding and must cease representing to potential clients that its services are guaranteed under this "guarantee." Beginning March 13, 2006, for each business day that Cornerstone fails to

---

[8]If the mere signing of the contract were a service, § 1679d(a)'s command that a CRO cannot provide services without a written contract would be nonsensical.

comply with this requirement, defendants must pay to the clerk of court a fine in the sum of $500.

Cornerstone may adopt a new form of guarantee, provided it complies in all respects with CROA. If Cornerstone chooses to do so, it must provide the government 30 calendar days to review the proposed SCA form.[9] It must also prepare and disclose to the government the written materials that it will provide its representatives to use in explaining the guarantee to prospective or actual clients, so that the government can lodge objections in this court. If no objections are timely filed, Cornerstone may begin using the revised SCA, guarantee, and written materials. Even if no objections are timely filed or the court approves the SCA, guarantee, and written materials after considering objections, Cornerstone is still prohibited from representing, directly or indirectly, to prospective or actual clients that it offers or provides a guarantee that is in any respect different from the one permitted to take effect in the absence of government objections or after court approval.

3

To ensure defendants' continued compliance with this memorandum opinion and order and the Consent Judgment, the provisions of § VIII(B)(2), (3), (4), (5), and (9) of the Consent Judgment shall be effective for an additional period of three years from the date this memorandum opinion and order is filed.

4

Defendants must pay to the United States its reasonable attorney's fees in prosecuting the contempt motion, in an amount to be awarded on separate application of the government or by

---

[9]Cornerstone can remove the existing "guarantee" without submitting the SCA to the government for its review. The review process is triggered only if it adopts a new form of guarantee. Accordingly, it is not incongruous to commence the conditional daily fine on March 13, 2006 while also imposing a 30-day review period for the government to consider a new form of guarantee that Cornerstone may choose to adopt.

agreed order.  If no agreement is reached, the government must file its application and a supporting

appendix within 30 days of the date this memorandum opinion and order is filed.  Defendants may

file an opposition brief and an opposition appendix within 20 days after the government's materials

are filed.  The government may file a reply brief within 15 days after defendants' materials are filed.

The briefs and appendixes must comply with the local civil rules of this court.

*   *   *

Accordingly, for the reasons set out, the court grants the government's motion to hold

defendants in contempt.

**SO ORDERED**.

March 3, 2006.

SIDNEY A. FITZWATER
UNITED STATES DISTRICT JUDGE